**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL MITCHELL, | ) | CASE NO. 3:25-CV-00608-JJH |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE |
| | ) | JUDGE JEFFREY J. HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| WARDEN DOUG LUNEKE, | ) | |
| | ) | **REPORT AND RECCOMMENDATION** |
| Defendant, | ) | |

## I.    Introduction

Petitioner, Michael Mitchell, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Mitchell is an Ohio prisoner who is currently serving an aggregate sentence of a minimum of 6 years to a maximum of 9 years in prison, and a consecutive sentence of 3 years.[1] (ECF No. 1). Respondent, State of Ohio filed a return of writ on September 22, 2025. (ECF No. 6). Mitchell filed a traverse on December 12, 2025. (ECF No. 9). On December 24, 2025, Respondent filed a sur-reply to the Traverse. (ECF No. 10).

This matter was referred to me under Local Rule 72.2 to prepare a report and recommendation on Mitchell's petition and other case-dispositive motions. Because Mitchell has presented only procedurally defaulted claims, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

---

[1] *See* Ohio Department of Rehabilitation & Correction, Offender Details,
https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A799761 (last accessed Apr. 17, 2026).

1

II.     **Relevant Factual Background**

The Ohio Court of Appeals for the Sixth Appellate District set forth the following facts on direct appeal:

{¶ 2} On July 7, 2020, appellant fired four shots in the parking lot of Gino's pizza restaurant, in Toledo. The first shot struck J.D., who died shortly afterward. Appellant claimed that he fired the subsequent three shots as "warning" shots, based on his fear that J.D. would get into a car with someone else who might give him a weapon.

{¶ 3} Appellant was indicted on one count of murder in violation of R.C. 2903.02(B) and R.C. 2929.02; one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D); and one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D). All the counts carried firearm specifications pursuant to R.C. 2941.145(A), (B), (C), and (F). The count of felonious assault in violation of R.C. 2903.11(A)(1) related to the first shot, which struck J.D. The count of felonious assault in violation of R.C. 2903.11(A)(2) related to the three shots fired after J.D. was struck by the first shot. Of the three later shots, one struck an occupied Lincoln Continental, and one or more struck an unoccupied Lexus.

{¶ 4} At trial, appellant requested a self-defense instruction for all the charges, as well as an instruction on aggravated assault, as an inferior degree of felonious assault. The trial court granted the request for the self-defense instruction as to the felonious assault charge in violation of R.C. 2903.11(A)(1) but denied the request as to the felonious assault charge in violation of R.C. 2903.11(A)(2). The court also denied the request for the instruction on the inferior degree offense of aggravated assault.

{¶ 5} The jury acquitted appellant of the murder charge and the felonious assault charge that was associated with the murder charge but convicted him of the felonious assault charge in violation of R.C. 2903.11(A)(2) and (D). It is from this conviction that appellant now appeals.

**Statement of Facts**

{¶ 6} At trial, there was testimony that on the evening of July 7, 2020, J.D. told a relative that he was "going to get into it" at Gino's with someone he believed had mistreated his girlfriend. J.D. confronted appellant, first verbally and then physically, when appellant walked out of the store. J.D. swung at appellant several times before finally landing a punch that knocked appellant over. Four seconds after the initial swing, appellant responded by firing a single shot, hitting J.D in the chest. J.D. fell to the ground behind a parked Lincoln Continental. Appellant walked up to J.D. as J.D. was lying on the pavement, writhing on his back. Moments later, appellant began heading toward his truck. But before reaching his truck, he turned and went back to the area of the Lincoln, and then appeared to pick something up off of the ground. The Lincoln then slowly started to pull away. At about the same

2

time, J.D. got to his feet and began running alongside the driver's side of the Lincoln, which was making its exit from the restaurant parking lot.

{¶ 7} Appellant, positioned himself behind the fleeing J.D. and fired three additional shots in J.D.'s direction. The Lincoln, which was clearly occupied at the time of the shooting, was later discovered to have blood and a bullet defect with "a big dent around it" on its exterior. An unoccupied Lexus was also struck by appellant's volley.

{¶ 8} The events were captured by various surveillance cameras, as well as a bystander's cell phone. J.D. was identified as wearing a white shirt, which revealed a blood stain as he stood up from the ground.

{¶ 9} J.D. died as a result of the gunshot wound. The autopsy of his body revealed that the bullet entered the left side of his chest through the sixth rib, traveled downward, grazed the bottom of his heart, and passed through his colon and left kidney before stopping in his lower back.

{¶ 10} Witnesses, including appellant, did not see J.D. with a weapon. No firearm was discovered in the parking lot, or in the vehicle that J.D. rode in to Gino's, or at the hospital where J.D. was treated.

**The testimony of K.A.J.** [FN 1: K.A.J. testified by video deposition, which was played at trial and appears in the appellate record, but does not appear to have been transcribed.].

{¶ 11} K.A.J. was close friends with J.D., whom he described as a defensive lineman who was "NFL ready." On the night of the shooting, K.A.J. and J.D. went to play pickup basketball at the Skyway Gym, in the city of Oregon, Ohio. K.A.J. did not see appellant at the gym and had never met him before.

{¶ 12} After leaving the gym, K.A.J. and J.D. drove to Gino's. J.D. talked with someone on the phone as they drove over, and K.A.J. himself was also talking on the phone. J.D. got out of the car and a few minutes later was shot.

{¶ 13} K.A.J. reviewed the surveillance video and identified his vehicle arriving in the Gino's parking lot at about 11:03 p.m. He also identified J.D. running toward K.A.J.'s car as appellant fired shots in J.D.'s direction. He testified that he was able to see the gunshots that appellant was firing, and that the shooter was not pointing the gun at the sky or toward the ground, but rather was pointing at J.D.

{¶ 14} K.A.J. got J.D. back in his car and drove to Toledo Hospital. J.D. was unable to communicate during the ride, and they arrived at an entrance which was locked due to COVID protocols. K.A.J. was attempting to break the door down when hospital                security                and                police                arrived.

### The testimony and cell phone recording of S.D.

{¶ 15} Gino's patron S.D. was waiting in a car at the restaurant while her husband went inside to pick up their order. The parking lot was lit and the store was busy.

3

S.D. was scrolling through Facebook when she heard a "pop." Assuming it was fireworks, she did not think much of it. She heard a second noise and turned to see two men "kind of wrestling." She started to record events on her phone, and more shots were audible on the recording.

{¶ 16} She testified that she saw a man wearing a white T-shirt running away while a man wearing a black T-shirt fired three shots at him. S.D. specified that the shooter did not fire the gun up in the air, but instead pointed the gun directly at the running man. She further testified that although the running man was alongside of a car, she did not see him try to get into the car; he was merely "running away from Gino's."

### Surveillance video

{¶ 17} A surveillance video recording from the front of the store depicts individuals who were waiting in line begin to run into the parking lot at around 23:13:16 p.m. Seconds later, at about 23:13:18, J.D. can be seen falling to the ground. At 23:13:20, appellant can be seen standing right behind J.D., as J.D. lay struggling and grabbing his chest. Appellant then leaves the camera view. J.D. is seen getting to his feet at about 23:13:26, and at 23:13:28, appellant reappears on the screen, behind the vehicle and in close proximity to J.D.

{¶ 18} Additional surveillance video depicts appellant chasing J.D. as he runs behind a Lincoln that is moving forward in the Gino's parking lot. Appellant can be seen pointing a gun at the individual who is running away, and two muzzle flashes appear on the screen. Appellant is then seen running to a red truck that he gets into and drives away at about 23:13:44.

{¶ 19} Another surveillance video depicts the interior of the restaurant, with a view of the front door. J.D. is seen standing outside the entrance of the store as the Lincoln pulls up to the entrance and a woman gets out to wait in line outside the door. Appellant walks out of the restaurant at about 23:12:55, at which point appellant and J.D. begin engaging with one another. At 23:13:12, J.D. throws the first punch, and at 23:13:16, the muzzle flash from the first shot can be seen. The Lincoln begins to pull forward at about 23:13:28, and at 23:13:30, an individual in white can be seen running in the same direction as the Lincoln. Individuals inside the restaurant peered out of the windows but ducked down or began to take cover at about 23:13:31.

{¶ 20} Still more surveillance video was taken from inside the store, focused on the front entrance. Here, appellant can be seen talking on the phone and walking out of the restaurant at 23:12:45. Individuals outside the glass doors are seen moving rapidly, and at 23:13:16, an individual waiting in line inside the door moves suddenly off screen. Other individuals came to look out the door, but quickly retreated at around 23:13:31.

{¶ 21} Toledo Police Detective Jeffrey Sharp testified that based on the reaction of bystanders and the muzzle flash, the first gunshot appears to have been fired at

4

about 23:13:16, and the second set of gunshots appear to have been fired at around 23:13:32. Shell casings

{¶ 22} Four shell casings were discovered at the scene. The shell casings and the bullet removed from J.D.'s body were compared to a test-fire of appellant's gun. The comparison confirmed that appellant's gun fired the shots.

### 911 call

{¶ 23} A passerby called 911 and reported seeing a heavy-set male with a white shirt, who had been shot in the chest, lying on the ground, with a second male, in a black T-shirt, standing over him.

### Mitchell interview

{¶ 24} In a pretrial interview, appellant said that he knew J.D. from high school but had not seen him in a year and a half before the day of the shooting. He stated that he had seen J.D. earlier that day at an open gym in Oregon, Ohio, without any apparent problems. When they encountered each other at Gino's, however, J.D. said, "I don't fuck with you," "my baby mamma said you tried to rape her," and "I should kill you right here." Appellant said that J.D. struck him and that when appellant jumped back, J.D. "reached for something." As a result, appellant fired his gun. Appellant stated that when J.D. got up and started running toward the car, he fired "two more warning shots," because he did not know who was in the car. He stated that he fired three shots in total. Mitchell's trial testimony

{¶ 25} At trial, appellant testified that he had seen J.D. earlier in the day at an open gym, but that he did not talk to him. He stated that as he exited Gino's restaurant, J.D. said, "I don't fuck with you," which appellant interpreted to mean that J.D. did not like him. According to appellant, J.D. said that his "baby mama" had accused appellant of trying to rape her, and that he "should kill" appellant. Appellant testified that J.D. had his fist balled up and was rocking back and forth, before he finally began to swing. Despite the exchange, appellant denied ever being angry with J.D. on the night of the shooting.

{¶ 26} Appellant admitted that J.D.'s first successful blow sent him falling into a nearby garbage can. But appellant said he fired his gun because J.D. was "fidgeting" with his pockets. Appellant did not warn J.D. that he was armed or show him that he had a gun before firing. He further stated that he was an arm's length, "if that," from J.D. when he fired the first shot. He said that he did not "point" the gun, but rather "just pulled it out and fired."

{¶ 27} Appellant said that he took his gun into Gino's because there were "a lot of people out there, a lot of cars and commotion." He acknowledged that his concealed carry license required him to report to police if he shot someone, but he stated that he never did "see" that he had hit J.D., despite J.D.'s fall to the ground onto his back after the first shot. Appellant claimed that he learned that J.D. was shot a couple of hours after the incident, through social media.

5

{¶ 28} Appellant stated that after firing the first shot, he went toward his truck but turned back to retrieve his cell phone. He admitted as he watched the video that while he stood over J.D., J.D. was moving around, and that "it could have been a possibility that he got hit," but he "didn't see anything that indicated that the bullet hit him at that time." He specifically denied being mad at J.D. at that time or at any time that night.

{¶ 29} Afterward, appellant said that he started running toward his truck and that he fired three more shots as he ran. He denied that he was chasing down J.D. or "trying to run and shoot him as he was running away," but he conceded that he did not fire straight up into the air. He explained: I only fired those shots when he was running cause I was still scared because he had got back up after the first altercation. So, and I didn't know if I hit him, and he was running along side of that car, so that's why I fired, like I said, the three warning shots because I didn't know if he was getting in that car. I didn't know if anybody in that car was with him, could have handed him anything. I just didn't know at that time. So it was just out of fear that's what I did. I wasn't aiming at him. I wasn't chasing him down trying to hit him. I was running to my car and I was shooting those warning shots. Appellant stated that he wanted to communicate that he was still armed and that he did not want any more trouble.

{¶ 30} Appellant claimed that he sustained a knot on his temple as a result of falling against the trash can, but did not require any medical treatment. He admitted that he did not suffer any significant injury in the altercation.

*State v. Mitchell*, Ohio 6th Dist. App. No. L-22-1166, 2023-Ohio-3543, ¶¶ 2–30. But Mitchell

disagrees with some of the facts included in the appellate court decision:

K.A.J. was interviewed by the police however he did not remember much. Although this witness stated during his deposition that he did not see the confrontation, he did state that the victim had been irritated all day. His testimony was that he saw the victim running towards his car as Mr. Mitchell ran in a different direction. He did not see Mr. Mitchell throw any punches.

(ECF No. 9 at 2) (April 28, 2022, Video Deposition hearing transcript; Doc. No. 6-2). Yet the facts

found by the appellate court "shall be presumed to be correct," and the petitioner has "the burden

of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.

§2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040

(1999).

## III.    Relevant State Procedural History

### A.    Indictment

Mitchell was indicted on July 16, 2020, on three charges, including:

one count of murder in violation of R.C. 2903.02(B) and R.C. 2929.02; one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D); and one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D). All of the counts carried firearm specifications pursuant to R.C. 2941.145(A), (B), (C), and (F). The count of felonious assault in violation of R.C. 2903.11(A)(1) related to the first shot, which struck J.D. The count of felonious assault in violation of R.C. 2903.11(A)(2) related to the three shots fired after J.D. was struck by the first shot. Of the three later shots, one struck an occupied Lincoln Continental, and one or more struck an unoccupied Lexus.

Exhibit 1, *Mitchell*, 2023-Ohio-3543, ¶ 3.

### B.    Trial and Guilty Verdict

The jury acquitted appellant of the murder charge and the felonious assault charge that was associated with the murder charge, but convicted him of the felonious assault charge in violation of R.C. 2903.11(A)(2) and (D).

*Id.*, 2023-Ohio-3543, ¶ 5. The trial court issued its judgment entry of sentencing on June 14, 2022.

Mitchell received an aggregate sentence of a minimum of 6 years to a maximum of 9 years in

prison, and a consecutive sentence of 3 years. (ECF No. 6-1, at Exhibit 15, PageID #: 167-69).

### C.  Direct Appeal

On July 18, 2022, Mitchell through counsel, filed an appeal in the Sixth Appellate District,

Court of Appeals, Lucas County, Ohio. (Exhibit 16, Notice of Appeal). On appeal, Mitchell raised

two assignments of error:

1. THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S REQUEST FOR A SELF-DEFENSE JURY INSTRUCTION ON COUNT 2, FELINOUS ASSAULT.

2. THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S REQUEST FOR A JURY INSTRUCTION ON THE INTERIOR DEGREE OFFENSE OF AGGRAVATED ASSAULT.

7

(ECF No. 6-1, at Exhibit 17, PageID #: 175). The State filed a brief in opposition. (Exhibit 18, Brief of Plaintiff-Appellee). On September 29, 2023, the court of appeals affirmed the trial court's judgment. (Exhibit 19, Decision and Judgment of 9/29/2023).

Mitchell, represented by current counsel, filed a notice of appeal in the Supreme Court of Ohio. (Exhibit 20, Notice of Appeal). On November 13, 2023, Appellant filed a Memorandum in Support of Jurisdiction asserting the following propositions of law:

> 1. A trial court abuses its discretion and prejudices a criminal defendant when failing to instruct the jury on self-defense as to all counts where a defendant has requested the instruction and there is sufficient evidence that self-defense is applicable to all counts having occurred as a continuing course of conduct.
>
> 2. A trial court abuses its discretion when it denies a criminal defendant's request for a jury instruction on an inferior degree offense of aggravated assault where self-defense has been found for the remaining counts and all counts occurred as a continuing course of conduct.

(Exhibit 21, Memorandum in Support of Jurisdiction). The State of Ohio filed an Appellee's brief (*Id.*, at Exhibit 22, PageID #: 267), and on January 23, 2024, the court declined to accept jurisdiction of the appeal under S. Ct. Prac. R. 7.08(B)(4). (Exhibit 23, OSC Entry of 1/23/2024).

### 1.  Ohio App. R. 26(B) Application to Reopen

On December 28, 2023, Mitchell, through counsel, filed an application to reopen his appeal pursuant to App. R. 26(B). (Exhibit 24, Application to Reopen, PageID #: 285). Mitchell claimed he received ineffective assistance of appellate counsel due to the following two assignments of error:

> 1.  Defendant's Sixth Amendment rights were violated when trial counsel failed to object to the admission of the video deposition testimony of K.A.J.
>
> 2.  The trial court erred by failing to comply with Ohio Criminal Rule 15(F) in permitting the video deposition testimony of K.A.J. to be played at the trial in the instant matter.

8

*Id*. On February 12, 2024, the State opposed the motion. (Exhibit 25, Opposition to Application for Reopening, PageID #: 298). On June 20, 2024, the Ohio Court of Appeals denied Mitchell's application to reopen the appeal. (Exhibit 26, Decision and Judgment of 6/20/2024, PageID #: 308). The Sixth Appellate District, Court of Appeals found that "[Mitchell] had not demonstrated a genuine issue as to whether there is a colorable claim of ineffective assistance of appellate counsel." *Id.* And Mitchell did not appeal this decision.

## IV.     Federal Habeas Corpus Petition

On March 27, 2025, Mitchell petitioned through counsel that this Court issue a writ of habeas corpus. (ECF No. 1). Mitchell asserted the following grounds for relief:

> **Ground One:** Mr. Mitchell's due process rights under the United States Constitution were violated when the trial court failed to instruct the jury on self-defense as to all counts where there was sufficient evidence that the counts all occurred as a continuing course of conduct, resulting in an unfair trial.
>
> Supporting Facts: After an altercation with the victim, Mr. Mitchell ran to retrieve his cell phone, and he noticed the victim get up and continue moving. As he retrieved his phone he fired warning shots. The trial court refused to give a self-defense jury instruction to the jury for the count that pertained to this conduct
>
> \*
>
> **Ground Two:** Mr. Mitchell's due process rights under the United States Constitution were violated and he was deprived of a fair trial where the trial court refused to give a jury instruction on an inferior degree offense that was supported by the evidence
>
> Supporting Facts: Mr. Mitchell was acting under strong provocation when he fired warning shots towards the victim.
>
> \*
>
> **Ground Three:** Mr. Mitchell's Sixth Amendment Confrontation Clause rights were violated where trial counsel failed to object to the admission of video deposition testimony.

9

Supporting Facts: Trial counsel did not object to the admission of video testimony of a key witness. This witness was an eye witness [sic] and his testimony was admitted through a video deposition taken prior to trial.

*

**Ground Four:** The trial court erred by admitting video deposition testimony in violation of Mr. Mitchell's Sixth Amendment rights.

Supporting Facts: The trial court permitted the State's main witness, who was an eyewitness to the incident, to testify via a recorded video deposition.

(ECF No. 1, at PageID #: 5–10).

## V. Legal Standards

### A. Timeliness of Petition

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year period of limitations for state prisoners to file their federal habeas corpus petitions. *Wall v. Kholi*, 562 U.S. 545, 550 (2011) (citing 28 U.S.C. § 2244(d)(1)); *Sexton v. Wainwright*, 968 F.3d 607, 609–10 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1064 (2021). There is no argument that Mitchell's federal habeas corpus petition was untimely. (*See* ECF No. 6).

### B. Jurisdiction

Title 28 U.S.C. § 2254(a) authorizes district courts to entertain an application for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d). The Court of Common Pleas of Lucas County sentenced Mitchell, and Lucas County is within this court's geographic jurisdiction. Accordingly, this Court has jurisdiction over Mitchell's § 2254 petition.

10

### C.  AEDPA Standard of Review

Turning to claims addressed on the merits in state court proceedings, 28 U.S.C. § 2254(d) provides that federal habeas relief shall not be granted unless the state court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of

11

the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id.*

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's … determination." *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

For state prisoners, the § 2254(d) standard "is difficult to meet… because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* at 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state courts decision conflicts with this Court's precedents" and "goes no further." *Id.* Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on

12

the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

### D.  Exhaustion

"A federal habeas corpus court should not grant a habeas corpus application by a state prisoner unless he has exhausted all of his available state court remedies on his grounds for relief. 28 U.S.C. § 2254(b) and (c)." *Gordon v. Bradshaw*, No. 104 CV 2299, 2007 WL 496367, at *12 (N.D. Ohio Feb. 12, 2007). "A petitioner satisfies the exhaustion requirement once the state supreme court provides him with an opportunity to review his claims on the merits and the state supreme court has had a full and fair opportunity to rule on the claims." *Id.* (citing *Dickerson v. Mitchell*, 336 F.Supp.2d 770, 786 (N.D. Ohio 2004) (citing *O'Sullivan*, 526 U.S. 838; *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir.1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990))). "If a remedy remains under state law that a federal habeas corpus petitioner has not yet pursued, exhaustion has not occurred, and the federal habeas court cannot review the merits of the claim." *Id*. (citing *Rust*, 17 F.3d at 160). "When a petitioner has failed to exhaust his state remedies, and when he can no longer do so under state law, his habeas claim is procedurally defaulted." *Adams v. Burton*, No. 16–1476, 2016 WL 6610219, at *2 (6th Cir. Nov. 8, 2016) (citing *O'Sullivan*, 526 U.S. at 848).

### E.  Procedural Default

Procedural default occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See generally*

13

*Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977); *Engle*, 456 U.S. at 125 n. 28; *Williams*, 460 F.3d at 806. In determining whether there has been a procedural default, the federal court again looks to the last explained state-court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). When a state court declines to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id*. at 732–33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009).

A petitioner procedurally defaults a claim by failing to "fairly present" the claim in state court when he does not pursue that claim through the state's "'ordinary appellate review procedures,'" and, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court

14

review."); *see also Gray v. Netherland*, 518 U.S. 152, 161–62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). A petitioner can overcome a procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004) ("The 'fundamental miscarriage of justice' gateway is open to a petitioner who submits new evidence showing that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' " (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995))).

## VI.    Discussion

### A.    Procedural Default

In his Traverse, Mitchell concedes that Grounds One and Two in his petition are subject to procedural default and therefore are dismissed. (ECF No. 9, at 5). Mitchell offers no argument to excuse his procedural default of Grounds One and Two nor that a miscarriage of justice will occur if the procedural default is not excused. *Id.* Mitchell argues, however, that his remaining claims are not subject to procedural default. *Id.* Thus, this Court reviews whether Petitioner's remaining claims in Grounds Three and Four of his petition are dismissed due to procedural default. Respondent argues that Mitchell's claims under Grounds Three and Four were not previously presented in his direct appeal and were only raised through the context of ineffective assistance of appellate counsel. (ECF No. 10 at 8).

Habeas corpus review of procedurally defaulted claims "is barred unless the prisoner can demonstrate cause for the default and actual prejudice ... or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To establish cause, a habeas corpus petitioner ordinarily must "show that some objective factor external to the defense" prevented the petitioner's compliance with a state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner may also invoke a miscarriage of justice when a petitioner provides new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent. *Hodges v. Colson*, 727 F.3d at 530. Mitchell argues that his procedural default as to Grounds Three and Four should be excused due to cause and prejudice stemming from his ineffective assistance of appellate counsel. (ECF No. 9, at 4–5).

16

### B. Cause & Prejudice

"To establish cause a petitioner must present a substantial reason to excuse his procedural default." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). This substantial reason requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citing as examples a showing that the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials made compliance impracticable). Moreover, Petitioner must establish "actual prejudice resulted from the alleged constitutional error." *Monzo v. Edwards,* 281 F.3d 568, 576 (6th Cir. 2002). Mitchell asserts that ineffective assistance of appellate counsel establishes cause and prejudice, therefore excusing his failure to raise the following claims: (1) Petitioner's Sixth Amendment Confrontation Clause rights were violated where trial counsel failed to object to the admission of video deposition testimony (2) the trial court erred by admitting video deposition testimony in violation of Petitioner's Sixth Amendment rights. (ECF No. 1, at 9–10).

### 1. Grounds Three and Four are Procedural Defaulted

In his petition, Mitchell's Ground Three asserts, "[Petitioner's] Sixth Amendment Confrontation Clause rights were violated where trial counsel failed to object to the admission of video deposition testimony." (ECF No. 1, at 9–10). In Ground Four, Mitchell asserts the trial court erred by admitting video deposition testimony in violation of his Sixth Amendment rights. *Id.* Yet, Mitchell concedes that he did not raise either of these claims in his direct appeal or in his appeal to the Ohio Supreme Court. *Id.* He first raised these claims in his Ohio App. R. 26(B) Application to Reopen. (Exhibit 24, Application to Reopen, PageID #: 285). Moreover, Mitchell attributes this failure to ineffective assistance of his *appellate* counsel. (ECF No. 1, at 9–10) (emphasis added).

17

He further contends that these errors establish "cause" that excuse his procedural default. *Id.* As both claims concern violations of the Sixth Amendment stemming from admission of the same evidence and allege ineffective assistance of *appellate* counsel as "cause" for procedural default, this Court considers the claims together below.

### i. Ineffective Assistance of Trial Counsel and the Confrontation Clause

In order to determine whether Mitchell's contentions of ineffective assistance of *appellate* counsel establish "cause" to overcome procedural default in his ineffective assistance of *trial* counsel claim, this Court must conduct de novo review of the merits of the underlying claim. *Turnbull v. Jackson-Mitchell*, 2023 WL 8261346 (N.D. Ohio Oct. 30, 2023), *report and recommendation adopted*, 2023 WL 8257934 (N.D. Ohio Nov. 29, 2023) ("This Court conducts *de novo* review of an ineffective assistance of counsel claim when determining whether it can establish cause to excuse a procedural default."): *see also Chase v. MaCauley*, 971 F.3d 582, 592 (6th Cir. 2020). As Petitioner correctly notes, ineffective assistance of appellate counsel can establish sufficient cause for failure to raise a claim that trial counsel was ineffective. *See Ivory v. Jackson,* 509 F.3d 284, 294 (6th Cir. 2007); *Howard v. Bouchard,* 405 F.3d 459, 478 (6th Cir. 2005). Yet "cause" may be established only if counsel's deficient performance is constitutionally ineffective. *See Strickland v. Washington,* 466 U.S. 668 (1984); *see also Murray v. Carrier,* 477 U.S. 478, 488–89 (1986).

In order to establish if counsel's deficient performance is constitutionally ineffective, Petitioner must meet two prongs. *Strickland*, 466 U.S. at 688. The Petitioner must demonstrate that counsel's performance fell "below the objective standard of reasonableness." *Id.* And the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable

18

probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694. The Supreme Court explained that the *Strickland* prongs may be examined in any order,

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
> *Id.* at 697.

Additionally, the Sixth Amendment affords criminal defendants the right to confront the witnesses against them. U.S. Const. amend. VI. Under the Confrontation Clause, a testimonial statement of a witness who does not testify at trial cannot be introduced for its truth unless the witness is unavailable and the defendant had a prior opportunity to examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). In *Crawford v. Washington*, the Supreme Court concluded that under the Confrontation Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court therefore held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68–69. The Supreme Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51–52 (internal quotations and citations omitted). While the Court declined to adopt any of these formulations, the Court determined that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford,* 541 U.S. at 68.

Here, K.A.J.'s video testimony, given under oath during a deposition requested due to his family vacation during trial, constitutes "testimonial" evidence subject to the Confrontation Clause. (ECF No. 6-1, PageID #: 161–63, April 27, 2022, State's Notice of a Request for Videotaped Deposition Per Crim. R. 15(B)). Additionally, Mitchell had the opportunity to cross-examine K.A.J. at the deposition. But *Crawford* highlights "[w]here testimonial evidence is at issue, ... the Sixth Amendment demands ... [both] unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68; *see also United States v. McCaney*, 177 Fed. Appx. 704, 708 (9th Cir. 2006) ("In a criminal trial, prior testimony of a witness may be admitted against a defendant consistent with the Sixth Amendment's Confrontation Clause if (1) the prosecution shows that the witness is unavailable, as it did here; and (2) the defendant had a prior opportunity to cross-examine the witness."). In determining whether a witness is "unavailable," the definition of "unavailability" in Rule 804(a) is a useful guide. *See Haggins v. Warden*, *Fort Pillow State Farm*, 715 F.2d 1050, 1055 (6th Cir. 1983).

In this case, KA.J. was not unavailable under Rule 804(a): he was not exempted from testifying on the basis of privilege; he did not persist in refusing to testify; he did not lack memory of the subject of his testimony; and he was not precluded from testifying by any physical or mental infirmity. *See* Fed. R. Evid. 804(a)(1)-(4). Nor was he unavailable simply because he was absent at the time of trial under Rule 804(a)(5), because the prosecutor was not "unable to procure [his] attendance ... by process or other reasonable means." Fed. R. Evid. 804(a)(5); *see Babcock v.*

*Metrish*, 2009 WL 4884969, at *8–*9 (E.D. Mich. Dec. 11, 2009). Despite his vacation plans, the prosecutor could have subpoenaed him to testify at trial, or the trial court could have delayed the start of the trial. *Id.* The trial court's accommodation of K.A.J.'s travel plans does not render him constitutionally "unavailable" under the Confrontation Clause. *See id; see also Earhart v. Konteh*, No. C–1–06–62, 2007 WL 2492307, at *13 (S.D. Ohio Aug. 29, 2007) (citing *Garner v. State*, 777 N.E. 2d 721, 725 (Ind. 2002)).

Turning to the *Strickland* standard, even when assuming the admission of K.A.J.'s video testimony violated Mitchell's Sixth Amendment right to confront witnesses against him, Mitchell has not established that there is a reasonable probability that the proceedings would have been different. Despite the admission of K.A.J.'s video testimony at trial, the majority of the evidence against the Petitioner was separate from the Confrontation Clause related testimony. *State v. Mitchell*, Ohio 6th Dist. App. No. L-22-1166, 2023-Ohio-3543, ¶¶ 15–21. Specifically, the evidence against the Petitioner included surveillance videos, bystander's cell phone video that captured the scene outside the restaurant, as well as bystander testimony. *Id.* at ¶¶ 15–21. The videos captured Mitchell's return to the scene to retrieve something from the ground near the victim's body after firing the first shot, and Mitchell firing additional shots toward the victim after the victim was struck by the first shot, collapsed, struggled to his feet, and attempted to run away. *Id.* at ¶¶ 16–18. The trial record also contains witness testimony that Petitioner stood over the victim's body after firing the first shot and before he fired the remaining shots. *Id.* "Considering the wealth of recording in this case, the violation of [Petitioner's] Confrontation Clause rights did not affect the outcome of his trial." *United States v. Khan,* 2021 WL 4026781, at 8 (6th Cir. 2021). Therefore, trial counsel's failure to object to the inclusion of K.A.J.'s testimony did not provide

"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688.

Generally, Confrontation Clause violations are subject to review for harmless error. *See Bailey v. Morrison*, No. 23-1254, 2023 WL 7877830, at *3 (6th Cir. Aug. 11, 2023) (citing *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020)). Under the Supreme Court's *Brecht* standard, to resolve the harmless error issue, the court must ask whether the constitutional violation "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As discussed above, Mitchell does not establish prejudice under the *Strickland* standard, so this Court holds that the admission of K.A.J.'s testimony and the resulting Confrontation Clause issue did not substantially impact the trial's outcome. *See Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016) ("[O]ur previous analysis of *Strickland* prejudice applies to the assessment of whether the Confrontation Clause violation was harmless error under *Brecht*."). Because trial counsel's failure to object to the admission of the video evidence and the trial court's admission of the evidence did not prejudice Petitioner, this Court finds Petitioner has not established "cause" for his failure to raise Ground Three and Four on direct appeal. Mitchell has therefore defaulted Grounds Three and Four of his habeas petition.

### ii. Ineffective Assistance of Appellate Counsel

And Mitchell fails to establish ineffective assistance of appellate counsel. Appellate counsel's failure to raise an issue on appeal is ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001). As detailed above, trial counsel's failure to challenge the admission of the video testimony and the trial court's admission of the video testimony did not influence the outcome of Mitchell's trial. *See Wright*, 665 Fed. Appx. at 410 (6th Cir. 2016)

22

(holding despite a defense counsel's failure to object on Confrontation Clause Grounds and a resulting violation of the petitioner's right to confrontation, the petitioner was not entitled to habeas relief as these violations did not affect the outcome of the trial). In this case, there was not a reasonable probability that the Ohio Court of Appeals would have been persuaded by either Mitchell's ineffective assistance of trial counsel claim or his confrontation clause claim concerning the admission of the video testimony. Therefore, even if appellate counsel raised these issues on appeal, it would not change the outcome of the trial. *See Hills v. McQuiggin*, 2012 WL 1079727, at \*16 (E.D. Mich. Mar. 30, 2012) ("Petitioner's trial counsel was not constitutionally ineffective under *Strickland* in failing to preserve a Confrontation Clause challenge, this failure therefore does not constitute cause to excuse the default of this claim."). As concluded previously, Mitchell has not established resulting prejudice under the *Strickland* standard. Neither Mitchell's *trial* counsel's performance nor his *appellate* counsel's performance prejudiced him under the *Strickland* standard, and so Mitchell has failed to establish "cause" to excuse his procedural default as to Grounds Three and Four of his habeas petition.

As Mitchell cannot establish cause to excuse his procedural default, the Court declines to address the issue of prejudice. *See Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) ("When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."); *Group v. Robinson*, 158 F. Supp. 3d 632, 651 (N.D. Ohio Jan. 20, 2016).

### 2. Evidentiary Hearing

Concerning Petitioner's request for an evidentiary hearing, "where claims are non-cognizable and/or procedurally defaulted, such claims require no further factual development and thus an evidentiary hearing is not needed." *Minor v. Wainwright*, 2019 WL 653789, \*8 (N. D.

Ohio Jan. 17, 2019); *Martin v. Hall*, 2010 WL 8435571 (N.D. Ohio March 31, 2010), *report and recommendation adopted by* 2012 WL 601912 (N.D. Ohio Feb. 23, 2012). Thus, Petitioner's request for an evidentiary hearing should be denied.

## VII.    Certificate of Appealability

### A.       Legal Standard

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c) ("A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right."). The "'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The granting of a certificate of appealability does not require a showing that the appeal would succeed on any claim. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

### B.       Analysis

Mitchell's entire petition is procedurally defaulted. If the Court accepts the foregoing recommendation, then Mitchell has not made a substantial showing of a denial of a constitutional right. He would then not be entitled to a certificate of appealability. Thus, I recommend that the Court not issue a certificate of appealability.

24

## VIII. Recommendation

Mitchell has presented only procedurally defaulted claims, and he should not be allowed to amend his petition to add new claims as doing so would be futile. Thus, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

DATED: April 27, 2026



Carmen E. Henderson
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within 14 days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).